UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:16-cv-81494-DMM

JOHN J. MULVANEY, Individually and On
Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

THE GEO GROUP, INC., et al.,

      Defendants.

_____/

## DEFENDANT THE GEO GROUP'S MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Defendant The Geo Group, Inc. ("GEO Group" or the "Company") respectfully moves to dismiss all claims asserted against it in the Amended Class Action Complaint ("Amended Complaint" or "Amended Compl.") filed by Lead Plaintiffs Brian A. Hellings and the Ann Hellings 2012 Trust ("Plaintiffs").

## INTRODUCTION

Plaintiffs' Amended Complaint – which is virtually identical in substance to the facially defective original Complaint – is a text-book example of a baseless "strike suit" following a precipitous decline in the share price of the GEO Group caused solely by the U.S. Department of Justice's ("DOJ") unexpected announcement of a shift in policy regarding the use of private correctional facilities as a result of allegedly declining federal inmate populations. The DOJ's announcement merely requested the assistance of the Federal Bureau of Prisons ("BOP") in reducing the scope of private correctional facility contracts "in a manner consistent with law and the overall decline of the [BOP's] inmate population." Plaintiffs seek to capitalize on the drop in the GEO Group's stock price by falsely accusing the Company of failing to disclose that its correctional facilities were somehow less safe, less effective and less efficient than federally operated facilities and failing to adhere to BOP contractual requirements. Plaintiffs also speciously claim that these purported deficiencies were the cause of the DOJ's shift in policy.

Plaintiffs' entire theory, however, is premised on a gross distortion of the DOJ's underlying rationale for its change in policy announced for the *very first time* in an August 18, 2016 memorandum to the BOP entitled "Reducing our Use of Private Prisons." While the DOJ's announcement included vague, generalized comments about supposed short-comings of private correctional facilities in comparison to BOP facilities, the real reason for the DOJ's change in policy was the recent reduction in the federal prison population and purported decrease in the demand for private correctional facilities, and ***not*** any action or inaction attributed to the GEO Group. Indeed, the DOJ's announcement did not even reference the GEO Group by name, much less assert that a *single* contract governing the Company's private correctional facilities had been terminated or non-renewed due to alleged performance issues or non-compliance with contractual requirements. To the contrary, all the DOJ did was direct the BOP to consider either not renewing or reducing the scope of contracts in the future when they came up for renewal.

Nevertheless, in a transparent effort to concoct a securities fraud claim from whole cloth, Plaintiffs' boiler-plate Amended Complaint simply references a handful of cherry-picked statements taken out of context from the GEO Group's public SEC filings and quarterly earnings calls, and alleges that these statements were *per se* fraudulent in light of the DOJ's change in policy. Plaintiffs seek to buttress their barren allegations by relying upon a magazine article, an ACLU report, and several inmate lawsuits as supposed proof of the GEO Group's purported failure to disclose the alleged subpar conditions of its private correctional facilities. As shown below, Plaintiffs' allegations fail, as each of the challenged statements are factually accurate and well-founded when placed in the proper context of the GEO Group's public statements.

Ironically, while Plaintiffs accuse the GEO Group of omitting material information relating to its business and operations, the only significant omissions in this case are the *Plaintiffs'* own intentional failure to reveal critical risk disclosures and cautionary statements in the GEO Group's SEC filings that are totally dispositive of Plaintiffs' specious fraud claims. These disclosures – which were contained in each and every one of the GEO Group's Form 10-K filings during the entire Putative Class Period – explicitly cautioned the Company's shareholders that (i) it was dependent on revenues derived from a limited number of governmental clients

such as the BOP; (ii) the Company's potential failure to comply with extensive government regulations and applicable contractual requirements for operating its private correctional facilities could result in the loss of governmental clients; and (iii) the loss or reduction of any of the GEO Group's contracts with any of these clients could potentially have a material adverse effect on the Company's finances, operations and stock price.

With this backdrop, a cursory review of the manufactured securities fraud claims in the Amended Complaint confirms that Plaintiffs have not and cannot adequately allege *any* basis remotely sufficient to survive scrutiny under the PSLRA and Supreme Court's seminal decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

First and foremost, Plaintiffs have not pled securities fraud with the specificity required by the PSLRA and Rule 9(b). To the contrary, all of the statements contained in the GEO Group's public SEC filings and earnings calls were true and accurate and did not omit any material information, and Plaintiffs have failed to allege any actual facts – as opposed to pure opinion and conjecture – in their Amended Complaint demonstrating otherwise.

Second, Plaintiffs have not pled sufficient facts establishing the element of scienter as to each of the alleged misrepresentations and omissions, much less the required *strong inference* of scienter. While Plaintiffs now seek to rely upon the biased and unsubstantiated opinions of "confidential witnesses" to prop up their deficient allegations of scienter, none of these witnesses even claims to have knowledge of any material misrepresentations or omissions that may be imputed to the GEO Group or any of the individual Defendants in this action.

Third, Plaintiffs' securities fraud claims are based primarily on non-actionable, forward-looking statements in the GEO Group's SEC Form 10-K public filings and quarterly earnings calls that were protected by the safe harbor provision of 15 U.S.C. § 78u-5.

Lastly, Plaintiffs fail to sufficiently plead the required element of loss causation, as there are no facts in the Amended Complaint establishing any plausible connection between the alleged statements or omissions at issue and the proximate causation of Plaintiffs' alleged losses.

In short, Plaintiffs' bare-bone allegations of securities fraud are facially defective and amount to nothing more than a thinly-veiled effort to extort a settlement predicated entirely on

the decline in the GEO Group's share price following a shift in the U.S. Government's policy on its future use of private correctional facilities.  As fully set forth below, Plaintiffs' allegations are demonstrably false and their Amended Complaint must be dismissed for failure to satisfy the fundamental pleading requirements of the PSLRA and Rule 9(b).

## FACTUAL BACKGROUND

### A.    The Amended Class Action Complaint's Allegations.

This a putative securities class action brought against the GEO Group under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of a putative class of all purchasers of GEO Group common stock from March 1, 2012 through August 17, 2016 (the "Putative Class Period").  Plaintiffs' Amended Complaint also asserts claims against individual Defendants George C. Zoley (GEO Group's CEO), Brian R. Evans (GEO Group's CFO), John Hurley (GEO Group's Senior Vice President of Operations) and David Donahue (GEO Group's President of GEO Corrections and Detentions division) for control person liability under Section 20(a) of the Exchange Act.

The GEO Group specializes in the management of correctional, detention and re-entry facilities and the provision of community-based services and youth services not only in the United States, but in Australia, South Africa, the United Kingdom and Canada as well.  *See* Amended Compl., ¶2; *see also* the GEO Group's SEC Form 10-K for the fiscal year ended December 31, 2015, attached as **Exhibit 1**, at p. 3.[1]  The GEO Group conducts business through four separate segments:  U.S. Corrections & Detention; GEO Care (f/k/a Community Services); International Services; and Facility Construction and Design.  *See* Exhibit 1, 2015 10-K, p. 4.

The original Complaint in this strike suit was filed on August 25, 2016, within days after the DOJ's announcement. The GEO Group filed its initial Motion to Dismiss the original Complaint on September 28, 2016 [DE 30], citing the numerous facial defects in their securities

---

[1]   It is well-settled that on a motion to dismiss a securities fraud action, the Court is free to consider any public records and documents, including SEC filings, that are central to a Plaintiffs' claims or referred to in the Complaint. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999).  The Company has accordingly attached as exhibits to this Motion *all* of its relevant SEC Form 10-K filings during the Putative Class Period.

fraud claims.  Plaintiffs' skeletal Amended Complaint fails to cure any of these fatal defects in their claims, and instead continues to allege that the GEO Group made the following materially false and misleading statements in its annual Form 10-K filings with the SEC from 2012 to 2016:

> (i) "We [the GEO Group] currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies," including three federal governmental agencies with correctional and detention responsibilities: the Bureau of Prisons, ICE and the U.S. Marshals Service.  Amended Compl., ¶¶ 67, 77, 90, 103, 116;

> (ii) "We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract."  Amended Compl., ¶¶ 68, 78, 91, 104, 117; and,

> (iii) "We have developed long-term relationships with our federal, state and other governmental customers, which we believe enhance our ability to win new contracts and retain existing business."  Amended Compl., ¶¶ 68, 78, 91, 104.

Plaintiffs similarly allege in vague and conclusory fashion that the GEO Group made false and misleading statements in its quarterly earnings calls during the period February 21, 2013 to August 2, 2016, including statements that (i) "[w]e [the GEO Group] have long-standing partnerships with the Federal Bureau of Prisons, the U.S. Marshals Service and the United States Immigration and Customs Enforcement or ICE;" (ii) "we provide cost-effective solutions for them at a number of facilities across the country," and (iii) "[w]e continue to see meaningful opportunities for [the GEO Group] to partner with all 3 of these federal agencies, notwithstanding the various issues with the federal budget."  Amended Compl., ¶ 76.

Significantly, Plaintiffs **do not allege** that any of the isolated, cherry-picked public statements made by the GEO Group in its SEC filings and quarterly earnings calls were in any way false or inaccurate on their face as a factual matter.  Plaintiffs instead contend that these statements were rendered false and misleading because the GEO Group failed to simultaneously disclose that: (i) the GEO Group's private correctional facilities allegedly lacked adequate safety and security standards and were less efficient at offering correctional services than federal BOP facilities; (ii) the GEO Group's private correctional facilities allegedly often failed to adhere to their contractual obligations in running the facilities; (iii) a significant risk allegedly existed that the DOJ would recommend phasing out BOP's contracts with the GEO Group, and (iv)

consequently, a risk also allegedly existed that other governmental agencies would similarly choose to investigate the company's private correctional facilities.  Amended Compl., ¶125.

**B.    The DOJ's Abrupt and Unforeseen Shift In Policy Concerning The Use Of Private Correctional Facilities.**

The sole basis for Plaintiffs' securities fraud allegations is the release of an August 18, 2016 memorandum to the BOP entitled "Reducing our Use of Private Prisons," that was authored by DOJ Deputy Attorney General Sally Q. Yates ("DOJ Memorandum").[2]  The DOJ Memorandum announced an abrupt and unexpected shift in the DOJ's long-standing policy and practice regarding the use of private correctional facilities, which Plaintiffs have blatantly mischaracterized in an attempt to concoct a securities fraud claim.

In relevant part, the DOJ Memorandum asserts that:

- Between 1980 and 2013, the federal prison population increased by almost 800% at a far faster rate than the BOP could accommodate;

- By 2013, the federal prison population peaked at 220,000 inmates, and the BOP housed approximately 15% of its population, or nearly 30,000 inmates, in privately operated correctional facilities;

- Since 2013, the prison population has declined for the first time in decades due to several significant efforts to recalibrate the federal sentencing, including retroactive application of revised drug sentencing guidelines, new charging policies for certain offenders, and the Obama Administration's clemency initiative; and

- Despite these efforts, the DOJ still estimated that by May 1, 2017, the total private correctional facility population would consist of approximately 14,200 inmates.

*See* Exhibit 2, DOJ Memorandum, pp. 1-2.

Despite its own admission that the federal private correctional facility population will still exceed 14,000 inmates by mid-2017, and without any analysis of whether or not the BOP's facilities will have sufficient capacity to absorb the private correctional facility inmate population, the DOJ nevertheless requested the BOP's assistance in "beginning the process of reducing – and ultimately ending – our use of privately operated prisons."  Exhibit 2, DOJ Memorandum, p. 2.  The DOJ thus directed that, as each private correctional facility contract

---

[2]   A true and correct copy of the DOJ Memorandum (which Plaintiffs references in, but did not attach to, the Amended Complaint) is attached as **Exhibit 2**.

expired, the BOP either decline to renew the contract or substantially reduce its scope "in a manner consistent with law and ***the overall decline of the Bureau's inmate population.***" *Id.* (emphasis added).  It is abundantly clear that the DOJ's change in policy was in fact driven by the *reduction* in the federal prison population and the alleged resulting *decrease* in the need for private correctional facilities, and *not* by any failure of the GEO Group to operate its facilities in compliance with applicable standards or its contracts with the BOP.

Further, while Plaintiffs' Amended Complaint focuses solely on the DOJ's negative comparisons between the performance of private correctional facilities vis-à-vis federal BOP facilities and services, the DOJ's comments are grounded entirely upon a false premise: that private correctional facilities can be compared to BOP facilities and services utilizing the same criteria and data.  Plaintiffs, however, obscure that the DOJ's comments were based on its own self-serving characterization of an August 11, 2016 report by the DOJ's Office of Inspector General entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" ("OIG Report"), and further fail to disclose that in response to the draft OIG Report, the BOP itself "continue[d] to caution against drawing comparisons of contract prisons to BOP operated facilities *as the different nature of the inmate populations and programs offered in each facility limit such comparisons*."   A true and correct copy of the BOP's Response to the OIG's Draft Report (which is attached as Appendix 8 to the final OIG Report) is attached as **Exhibit 3**.[3]

As the BOP forewarned, private correctional facilities like those operated by the GEO Group have vastly different prison populations comprised largely of non-resident aliens convicted of immigration, drug-trafficking, gang violence and related offenses.  This gives rise to diverse problems that are unique to private correctional facility inmate populations and which prevent any meaningful or accurate comparison to the safety, efficiency or effectiveness of

---

[3]   The DOJ Memorandum and the OIG Report (which itself includes the BOP's Response as Appendix 8) are central to the Plaintiffs' fraud claims.  *See*, e.g., Exhibit 2, DOJ Memorandum, p. 1.  The Court is thus permitted to consider the BOP's Response in ruling on the GEO Group's Motion to Dismiss.  *See Jackson v. BellSouth Telecommunications, Inc.*, 181 F. Supp. 2d 1345, 1353-54 (S.D. Fla. 2001) (the court may take into account the complaint's exhibits, matters of public record, orders, and items appearing in the record without converting a motion to dismiss into one for summary judgment, and this catalog is further expanded "where the Plaintiffs refers to certain documents in the complaint and these documents are central to the Plaintiffs' claim").

private correctional facilities vis-à-vis BOP operated facilities.  Equally significant, the OIG Report only addressed ways to improve the *monitoring* of private correctional facilities and it ***did not*** recommend that the DOJ even reduce the use of private correctional facilities, much less eliminate private correctional facilities all together.  *See* BOP's Response to OIG's Draft Report, Exhibit 3 (wherein BOP agreed with all four (4) of the OIG's recommendations for improving the monitoring of private correctional facilities).  And while Plaintiffs mischaracterize the OIG's Report as the driving force behind the DOJ's shift in policy concerning the future use of private correctional facilities, it is undisputed that the OIG's Report did not identify ***a single contract*** with the GEO Group that was terminated or non-renewed due to alleged performance or contractual compliance issues at any of the GEO Group's private correctional facilities.

      **C.**      **The Amended Complaint Intentionally Omits Highly Material Disclosures Concerning the GEO Group's Business, Finances and Stock Price.**

While Plaintiffs seize upon bits and pieces of the GEO Group's public SEC filings and quarterly earnings calls as the basis for their securities fraud claims, they have predictably omitted from the Amended Complaint numerous highly material risk disclosures contained in those same filings that are fatal to Plaintiffs' fraud claims.

The Court may properly consider the GEO Group's entire SEC filings – including all risk disclosures and cautionary statements – during the Putative Class Period in determining the sufficiency of Plaintiffs' Amended Complaint.  *Bryant*, 187 F.3d at 1287; *see also* 15 U.S.C. § 78u–5(e) (authorizing the court in a securities fraud action to consider "any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant").  This rule is particularly applicable in this action in light of Plaintiffs' selective reference to the GEO Group's SEC filings and earnings calls, as it prevents Plaintiffs from "excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement."  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996).

Most notably, Plaintiffs' Amended Complaint conceals that the GEO Group's Form 10-K filings for each and every year during the Putative Class Period contain a section entitled "Risk

Factors" that discloses – in conspicuous bold, italicized font – a multitude of risks that "could materially adversely affect our business, financial condition, or results of operations," including the *very same risks* that Plaintiffs falsely accuses the GEO Group of misrepresenting or omitting in its public filings.  *See* Exhibit 1, 2015 10-K, p. 24; GEO Group 2011 10-K, attached as **Exhibit 4**, at p. 28; GEO Group 2012 10-K, attached as **Exhibit 5**, at p. 22; GEO Group 2013 10-K, attached as **Exhibit 6**, at p. 26; GEO Group 2014 10-K, attached as **Exhibit 7**, at p. 26.

### 1. The GEO Group Explicitly Disclosed The Potential Loss of Its Private Correctional Facility Governmental Contracts.

As referenced in the Amended Complaint, the GEO Group filed its Form 10-K for the period ending December 31, 2015 with the SEC on February 26, 2016.  Amended Compl. ¶116. Among the risk factors prominently featured in the GEO Group's 2015 10-K were those "Risks Related to Our Business and Industry."  Exhibit 1, p. 31.  This section included an explicit warning about the potential loss of the Company's private correctional facility contracts:

> ***We are subject to the loss of our facility management contracts, due to terminations, non-renewals or competitive re-bids, which could adversely affect our results of operations and liquidity, including our ability to secure new facility management contracts from other government customers.***
>
> We are exposed to the risk that we may lose our facility management contracts primarily due to one of three reasons: (i) the termination by a government customer with or without cause at any time; (ii) the failure by a customer to exercise its unilateral option to renew a contract with us upon the expiration of the then current term; or (iii) our failure to win the right to continue to operate under a contract that has been competitively re-bid in a procurement process upon its termination or expiration.
>
> . . .
>
> The loss by us of facility management contracts due to terminations, non-renewals or competitive re-bids could materially adversely affect our financial condition, results of operations and liquidity, including our ability to secure new facility management contracts from other government customers.

Exhibit 1, 2015 10-K, p. 32 (emphasis in original).

The GEO Group also emphasized these very risks elsewhere in its 2015 10-K when discussing its governmental contracts:

**Government Contracts — Terminations, Renewals and Competitive Re-bids**

Generally, *we may lose our facility management contracts due to one of three reasons*: the termination by a government customer with or without cause at any time; the failure by a customer to renew a contract with us upon the expiration of the then current term; or our failure to win the right to continue to operate under a

> contract that has been competitively re-bid in a procurement process upon its termination or expiration.  Our facility management contracts typically allow a contracting governmental agency to terminate a contract with or without cause at any time by giving us written notice ranging from 30 to 180 days.  ***If government agencies were to use these provisions to terminate, or renegotiate the terms of their agreements with us, our financial condition and results of operations could be materially adversely affected***.

Exhibit 1, 2015 10-K, p. 32 (emphasis added).

Without question, these detailed disclosures placed the Plaintiffs – as well as every other GEO Group shareholder – on notice that while the Company's business, finances and operations were well diversified across different geographical markets and segments, it could be exposed to adverse consequences in the event the U.S. Government decided to terminate or non-renew its private correctional facility contracts with the Company.  This is the ***exact risk*** emanating from the DOJ's abrupt shift and unforeseen in policy on its future use of private correctional facilities that was announced for the very first time in the August 18, 2016 DOJ Memorandum.

### 2.  The GEO Group Explicitly Disclosed Its Revenue Dependency On A Limited Number of Governmental Clients.

The GEO Group's public risk disclosures also contained the following specific, detailed warning about the Company's revenue dependency on a limited number of governmental clients:

> ***We depend on a limited number of governmental customers for a significant portion of our revenues.  The loss of, or a significant decrease in revenues from, these customers could seriously harm our financial condition and results of operations.***

*See* Exhibit 1, 2015 10-K, p. 32 (emphasis in original).  Incredibly, this disclosure immediately preceded the very statement that Plaintiffs now allege was false and misleading:

> We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies.  Of our governmental partners, four customers, through multiple individual contracts, accounted for 45.5% of our consolidated revenues for the year ended December 31, 2015.

*Id.*, pp. 33-34; *see also* Amended Compl., ¶116.  The GEO Group even quantified this risk in its 2015 10-K in a section entitled "Business Concentration," disclosing that various agencies of the U.S. Federal Government (which includes the BOP) comprised 45% of its revenues in 2015, 42% of its revenues in 2014 and 45% of its revenues in 2013. *See* Exhibit 1, 2015 10-K, p. 23.

**3.**      <u>The GEO Group Explicitly Disclosed the Risks Associated With Its Potential Non-Compliance With Regulatory and Contractual Requirements Or With Adverse Publicity Regarding Its Facilities.</u>

Plaintiffs' central fraud allegation is that the GEO Group failed to affirmatively disclose that the Company's private correctional facilities were allegedly less safe, less efficient and less effective than comparable BOP facilities and often failed to adhere to applicable contractual requirements, and thereby concealed the "significant risk" that the DOJ or other governmental agencies would recommend phasing out the Company's contracts. *See* Amended Compl., ¶125. While Plaintiffs' fabricated claims are grounded on a flagrant distortion of the DOJ's Memorandum and OIG Report, the GEO Group's SEC filings nonetheless explicitly warned its shareholders that its past or future failure to comply with applicable governmental regulations and contractual requirements could result in the loss of governmental contracts and clients:

> ***Failure to comply with extensive government regulation and applicable contractual requirements could have a material adverse effect on our business, financial condition or results of operations.***

*See* Exhibit 1, 2015 10-K, p. 36 (emphasis in original). The GEO Group buttressed this risk disclosure with the following detailed cautionary statement:

> The industry in which we operate is subject to extensive federal, state and local regulation, including educational, environmental, health care and safety laws, rules and regulations, which are administered by many regulatory authorities. . . . ***We may not always successfully comply with these and other regulations to which we are subject and failure to comply can result in material penalties or the non-renewal or termination of facility management contracts.***

*Id.* (emphasis added). Thus, while the Amended Complaint cites to a 2016 article by Seth Freed Wessler in *The Nation* (the "Wessler Article"), a June 2014 report drafted by the American Civil Liberties Union (the "ACLU Report"), and several inmate lawsuits filed during the Putative Class Period as supposed evidence that the GEO Group concealed alleged sub-par conditions and treatment provided to inmates at its private correctional facilities, the Company in fact disclosed the risks associated with its potential inability to successfully comply with governmental regulations and contractual requirements at all material times. Moreover, the GEO Group even disclosed the risk of adverse publicity (*e.g.*, the Wessler Article and the ACLU Report) relating to alleged or perceived conditions at its private correctional facilities:

*Adverse publicity may negatively impact our ability to retain existing contracts and obtain new contracts.*

Any negative publicity about an escape, riot or other disturbance or perceived conditions operated at a facility under a public-private partnership . . . may make it more difficult for us to renew existing contracts or to obtain new contracts or could result in the termination of an existing contract or the closure of one or more of our facilities, which could have a material adverse effect on our business.

*Id.,* at p. 36 (emphasis in original).

### 4. The GEO Group Disclosed the Risks To Its Stock Price Associated With Changes In The Prospects for Private Correctional Facilities.

In addition to the pointed risk disclaimers detailed above, the GEO Group disclosed that its stock price might be adversely affected by a change in public-private partnerships in the correctional facility industry. The Company's 2015 10-K thus disclosed that "[t]he market price of our common stock may vary substantially" and other factors that could affect the market price of the Company's common stock included "*changes in the prospects of public-private partnerships in the corrections and detention industry.*" *See* Exhibit 1, 2015 10-K, pp. 43-44 (emphasis added). Once again, the GEO Group disclosed the *exact risk* to its stock price that Plaintiffs now accuse it of hiding, *i.e.*, the potential for a change in the federal government's policy to reduce or eliminate altogether the use of private correctional facilities.

### 5. The GEO Group Included Virtually Identical Cautionary Statements in its Form 10-K Filings During the Entire Class Period.

Plaintiffs compound their mischaracterization of the GEO Group's SEC filings by failing to acknowledge that these identical or substantially similar risk disclosures were contained in each and every Form 10-K that the GEO Group filed with the SEC during the Putative Class Period. *See* Exhibit 4, GEO Group 2011 10-K, at pp. 24, 32, 34, 38, 45; Exhibit 5, GEO Group 2012 10-K, at pp. 19, 29, 31, 32, 38; Exhibit 6, GEO Group 2013 10-K, at pp. 21, 34, 36-37, 39, 46; and Exhibit 7, GEO Group 2014 10-K, at pp. 21, 34-35, 37, 39-40, 47.

## ARGUMENT

### A. THE PSLRA IMPOSES HEIGHTENED PLEADING STANDARDS FOR FEDERAL SECURITIES CLAIMS.

In order to state a viable claim for securities fraud under Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiffs were required to allege: (1) a misstatement or omission; (2) of a

material fact; (3) made with scienter; (4) on which the Plaintiffs justifiably relied; and (5) that proximately caused the Plaintiffs' injury. *Bryant,* 187 F.3d at 1281. In an effort to stem the rampant tide of abusive securities litigation and dispose of non-meritorious securities fraud claims at the pleading stage, the PSLRA significantly heightened the pleading standards for Section 10(b) claims. *Id.* As such, the PSLRA imposes two key requirements and provides that, if they are not satisfied, "the court ***shall***, on the motion of any defendant, ***dismiss the complaint***." 15 U.S.C. § 78u-4(b)(3)(A) (emphasis added).

First, Plaintiffs are required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief,… [to] state with particularity all facts on which that belief is formed." *Id.,* § 78u-4(b)(1). Second, Plaintiffs are required, "with respect to ***each act or omission alleged*** . . . [to] state ***with particularity*** facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added). To satisfy this standard, all of the facts alleged, taken together, must give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Section 10(b) claims are also subject to Rule 9(b)'s requirement that fraud must be pled with particularity, a rule designed to thwart generalized fraud allegations that "enable[] [Plaintiffs] to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation . . . ." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006). Rule 9(b) thus required Plaintiffs to plead "(1) precisely what statements were made in which documents or oral representations . . ., and (2) the time and place of each such statement and the person responsible for making . . . same, and (3) the content of such statements and the manner in which they misled the Plaintiffs, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

B.   **PLAINTIFFS' BOILERPLATE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(B) OR RULE 10B-5.**

Plaintiffs' securities fraud claims must be dismissed because their Amended Complaint fails to adequately plead any of the requisite elements under Section 10(b) and Rule 10b-5.

1.   <u>**Plaintiffs Fail To Plead Fraud, Including Falsity and Materiality, With Particularity.**</u>

The Amended Complaint must be dismissed as a threshold matter because Plaintiffs fail to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" with the particularly required by PSLRA and Rule 9(b).

Plaintiffs' entire case is built on the flimsy claim that the DOJ's decision to phase out the use of private correctional facilities is *per se proof* that the GEO Group failed to disclose that its correctional facilities were inferior to BOP operated facilities and failed to adhere to governing contractual requirements.  Plaintiffs' theory of liability is flawed from the outset, as the DOJ's Memorandum evidences nothing more than a policy change in the DOJ's *future* use of private correctional facilities due to supposedly declining federal prison populations.

While Plaintiffs rely on the DOJ's vague, generalized comparisons between private and BOP correctional facilities as the basis for their fraud claims, the Amended Complaint fails to identify any facts with any specificity that would render any of the GEO Group's public statements concerning its facilities or services in any way false or misleading.  Conspicuously, the DOJ Memorandum does not cite to a shred of evidence that supports its broad-brush comparisons between the safety, efficiency or effectiveness of private correctional facilities versus BOP facilities, or that otherwise validates the DOJ's unsubstantiated characterization of the purported performance of private correctional facilities.  *See* Exhibit 2, DOJ Memorandum.

Plaintiffs' related argument – that the DOJ Memorandum resulted from the GEO Group's alleged failure to disclose that its BOP contracted private correctional facilities often failed to adhere to applicable contractual requirements – is similarly devoid of merit.  There are no facts or even bare allegations contained anywhere in the DOJ's Memorandum that any of the specific correctional facilities *operated by the GEO Group* failed to comply with the BOP's contractual requirements, much less that any of the Company's contracts to operate its facilities were ever

terminated or non-renewed as a result of any such non-compliance.  Indeed, the most glaring flaw in Plaintiffs' singular reliance on the DOJ Memorandum is the fact that there is no reference to the ***GEO Group*** anywhere in the document.  Yet, Plaintiffs' Amended Complaint is premised entirely on the GEO Group's alleged failure to disclose that *its* correctional facilities were less safe, efficient and effective than BOP facilities and that *it* failed to adhere to applicable BOP contractual requirements, and that the Company was consequently at risk of the DOJ abruptly recommending that the BOP phase out its contracts with the GEO Group.  This is the slimmest reed imaginable upon which to hang a securities fraud claim under Section 10(b) and Rule 10b-5.

### 2.      The GEO Group's Alleged Misrepresentations Are, In Fact, Accurate.

Plaintiffs similarly fail to allege facts showing that the GEO Group's public statements in its SEC filings and quarterly earnings calls were anything but 100% true and accurate.

### (a).     The Company's Annual and Quarterly SEC Filings Were Accurate.

The first material misrepresentation alleged by Plaintiffs is the GEO Group's statement in its annual Form 10-K filings that "[w]e currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies."  Amended Compl., ¶¶67, 77, 90, 103, 116.  Tellingly, these disclosures do not state what Plaintiffs falsely insinuate:  that the Company expected or guaranteed that these revenues from limited government clients would continue unabated, indefinitely, or at the same level as past years.  Undeterred, Plaintiffs instead *imply* this statement was false because the GEO Group must have known and failed to disclose that its private correctional facilities lacked adequate safety and security standards, were less efficient than BOP facilities, and failed to comply with contractual requirements, and thus the Company was at risk of losing these revenues.  *See id.*, ¶125.

Plaintiffs thus seek to distort the true facts and fabricate a claim that does not exist by concealing that the challenged statements were actually contained in the "Risk Factor" section of the GEO Group's annual 10-K filings and immediately preceded by a conspicuous disclaimer:

> ***We depend on a limited number of governmental customers for a significant portion of our revenues.  The loss of, or a significant decrease in revenues from, these customers could seriously harm our financial condition and results of operations.***

> We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies.  Of our governmental partners, four customers, through multiple individual contracts, accounted for 45.5% of our consolidated revenues for the year ended December 31, 2015.  In addition, three federal governmental agencies with correctional and detention responsibilities, the Bureau of Prisons, ICE, and the U.S. Marshals Services, accounted for 44.9% of our total consolidated revenues for the year ended December 31, 2015 through multiple individual contracts . . .

*See* Exhibit 1, 2015 10-K, p. 32 (emphasis in original).

It was painfully obvious to any impartial reader that the plain intent of these disclosures was to place the GEO Group's shareholders on notice that the loss or decrease in revenues derived from the Company's limited governmental clients could adversely affect its financial position and stock price.  Plaintiffs have simply cut and pasted incomplete portions of the GEO Group's risk disclosures into the Amended Complaint in an effort to create the false impression the Company was *affirmatively* stating its revenues from limited governmental clients would continue unabated.  Yet, placed in the proper context, this statement was an accurate disclosure of the risks inherent in the Company's revenue dependency upon limited government clients.

Plaintiffs have likewise failed to plead specific facts casting any doubt on the truth or accuracy of the GEO Group's statements in its annual 10-K's that it had "developed long-term relationships with our federal, state and other governmental customers, which we believe enhance our ability to win new contracts and retain existing business" and that "various agencies of the U.S. Federal Government were the only major customers that made up greater than 10% of the GEO Group's revenues for each of the preceding three years."  *See* Amended Compl., ¶¶68, 78, 91, 104.  The Amended Complaint is silent as to how or why these statements are misleading, and any attempt by Plaintiffs to rely upon the DOJ's Memorandum is futile since that document neither references the GEO Group nor asserts any actual facts evidencing that these statements in the Company's 10-K filings were in any way false or misleading.

Lastly, Plaintiffs have not alleged facts demonstrating that the GEO Group's annual 10-K filings falsely stated that it operates its facilities "in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract."  Amended Compl., ¶¶68, 78, 91, 104.  Instead, Plaintiffs unsurprisingly rely on the DOJ Memorandum as *per se* evidence that these statements were somehow false and misleading,

without explaining *how* or *why* this is so.  Yet, the DOJ Memorandum does not even reference the GEO Group, much less contain facts supporting Plaintiffs' claim that the Company's alleged failure to operate its facilities in compliance with its policies or the terms of its BOP contracts resulted in the DOJ's abrupt shift in policy concerning the use of private correctional facilities.

This critical point vividly illustrates the defective nature of Plaintiffs' securities fraud claims.  Plaintiffs have not pled any facts establishing that the GEO Group had any contractual, legal or regulatory duty or obligation to operate its private correctional facilities in a manner that was *more safe, more efficient or more effective* than BOP operated correctional facilities.  To the contrary, the GEO Group fully disclosed in its annual 10-K filings that it operated its facilities "in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract."  *See* Exhibit 1, 2015 10-K, p. 5.

Plaintiffs similarly fail to plead facts evidencing that the DOJ's Memorandum resulted from the GEO Group's failure to maintain adequate safety and security standards or to comply with its BOP contracts.  While Plaintiffs seek to rely upon the OIG Report, the Wessler Article, and the ACLU Report as evidence the GEO Group failed to disclose that it was not operating its private correctional facilities in compliance with its BOP management contracts (a fact the GEO Group vehemently denies), it is undisputed that the Company's SEC filings consistently and explicitly warned investors that its past or future failure to comply with applicable regulations and contractual requirements could result in the loss of governmental contracts and clients.  *See, e.g.,* Exhibit 1, 2015 10-K, p. 36 (disclosing in bold print that the "*[f]ailure to comply with extensive government regulation and applicable contractual requirements could have a material adverse effect on our business, financial condition or results of operations").*

Consequently, even if the Court were to take the DOJ's Memorandum at face value and accept its comments on the perceived short-comings of private correctional facilities compared to BOP correctional facilities as the gospel truth, the DOJ Memorandum *still* would not provide any legally sufficient factual basis for the Plaintiffs' fraud claims because there is nothing contained therein that remotely evidences the GEO Group's alleged failure to operate its facilities in accordance with its own policies or the standards and guidelines contained in its BOP contracts.

Simply stated, Plaintiffs fail to state a claim for securities fraud based on any of the allegedly false or inaccurate statements contained in the GEO Group's SEC filings.

### (b).     The GEO Group's Quarterly Earnings Calls Were Accurate.

Plaintiffs also now allege that the GEO Group's quarterly earnings calls contained materially misleading statements or omissions during the class period.  Amended Compl., ¶¶76. Once again, however, Plaintiffs fail to identify actual facts supporting these baseless allegations.

The vast majority of the quarterly earnings calls placed at issue in the Amended Complaint consist of factual statements concerning specific aspects of the GEO Group's operations and business opportunities with respect to new and existing contracts for the Company's correctional facilities, along with several forward-looking statements and opinions regarding the Company's business outlook.  *See* Amended Compl., ¶¶80, 83, 86, 89, 93, 96, 99, 102, 106, 109, 112, 115, 119, 122.  For example, Plaintiffs first take issue with the following cherry-picked statements made by Defendant John Hurley on the GEO Group's February 21, 2013 earnings call for the quarter and year ended December 31, 2012:

> I'd like to address select publicly known business development opportunities in our key segments starting with the federal market in the 3 federal government agencies that we serve.  We have long-standing partnerships with the Federal Bureau of Prisons, the Unites States Marshals Service and the United States Immigration and Customs Endorsement or ICE.  And we provide cost-effective solutions for them at a number of facilities across the country.  We continue to see meaningful opportunities for us to partner with all 3 of these federal agencies, notwithstanding the various issues with the federal budget.  The Federal Bureau of Prisons continues to face capacity constraints coupled with a growing offender population.  *See* Amended Compl., ¶76.

Plaintiffs then repeat the same strategy throughout the Amended Complaint by either identifying isolated statements concerning specific aspects of the GEO Group's business operations made during the Company's quarterly earnings calls, or more frequently by simply alleging, in vague and conclusory fashion, that Defendants "repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76."  *See* Amended Compl., ¶¶80, 83, 86, 89, 93, 96, 99, 102, 106, 109, 112, 115, 119, 122.

Yet, not once do Plaintiffs even attempt to allege with particularity how or why the statements in the GEO Group's earnings calls were in any way false, inaccurate or misleading. Plaintiffs do not allege that any of the detailed statements concerning the GEO Group's efforts to retain or procure new management contracts with the BOP, ICE, or U.S. Marshals Service were materially false as a factual matter.  Plaintiffs similarly fail to plead specific facts casting any doubt on the truth or accuracy of the Company's statements "regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations." *See* Amended Compl., ¶¶80, 83, 86, 89, 93, 96, 99, 102, 106, 109, 112.  Suffice it to say, none of these statements in the GEO Group's earnings calls is remotely actionable under Section 10(b) and Rule 10b-5 as a consequence of Plaintiffs' failure to identify facts with the specificity required by the PSLRA and Rule 9(b) that would render the statements false or misleading.

Plaintiffs' attempt to ground their Section 10(b) and Rule 10b-5 claims upon a handful of statements of optimism in the GEO Group's quarterly earnings calls is likewise unavailing. Specifically, Plaintiffs allege that the following statements were materially false and misleading:

- "As we look into the third quarter, we have several reasons to be ***optimistic***."  Amended Compl., ¶109 (emphasis added);

- "We are very ***pleased*** with our strong fourth quarter results and our ***outlook*** for 2016 which reflect the continued organic growth of our diversified business segments of GEO Corrections & Detention and GEO Care."  Amended Compl., ¶115 (emphasis added);

- "We ***believe*** that our unique platform of correctional and rehabilitation services better positions GEO to capture future growth, which will enhance value for our shareholders and allow us to continue to grow our earnings, cash flows and dividend payments." Amended Compl., ¶119 (emphasis added); and

- "As it relates to CAR 16, we are ***optimistic*** that our projects will be reviewed favorably for continued use.  We have a very good relationship with the Bureau of Prisons and our seven facilities with the 15,000 beds operational performances at the appropriate levels and exceeding our expectations and the client's expectations.  So we have no reason to ***believe*** that they the client will not view them appropriately on a going forward basis." Amended Compl., ¶76 (emphasis added).

It is axiomatic that these are generalized statements of corporate optimism – not statements of material fact – that courts have routinely held are not actionable under the federal securities laws.  *See In re Royal Caribbean Cruises Ltd. Securities Litig.*, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) (holding that "[a] statement that is vague, generalized, or 'mere

corporate puffery' is immaterial because a reasonable investor would not base a decision on such statements."); *Philadelphia Fin. Mgmt. of San Francisco v. DJSP Enters., Inc*., 2011 WL 4591541, at *14, 17 (S.D. Fla. Sept. 30, 2011) (statements about the "efficiency" and "accuracy" of operations and that company was "well positioned" were "non-actionable 'puffery'").

Alternatively, the statements are in the nature of predictive opinion, which are actionable only if they are both subjectively and objectively false – that is, only (1) if the speaker did not genuinely hold the opinion and (2) the opinion lacked a reasonable basis. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991). Plaintiffs, however, fail to allege any facts with the particularity required by the PSLRA and Rule 9(b) showing that the Defendants did not in fact believe the opinions expressed or that the opinions lacked any reasonable basis. *See Belmont Holdings Corp. v. Sun Trust Banks, Inc.*, No. 1:09-cv-1185-WSD, 2010 WL 3545389, at *6 (N.D. Ga. Sept. 10, 2010) (dismissing claim "[a]bsent an allegation that Defendants did not believe the statements"). Defendants are also shielded from liability for these statements by the safe harbor and the bespeaks caution doctrine, as the statements are undeniably forward-looking because they either explicitly speak to future events or involve opinions that can be assessed only in light of future events. *See, e.g., Harris v. Ivax Corporation*, 182 F.3d 799, 805 (11th Cir. 1999) (holding that statements that "our fundamental business and . . . strategies remain intact" and are "very well positioned" were forward-looking); *In re Mako Surgical Corp.*, 2013 WL 2145661, at *6 (S.D. Fla. May 15, 2013) (statement that "[w]e anticipate that our positive results in 2011 will carry forward into 2012" was forward-looking). In short, Plaintiffs' fraud claims arising out of the GEO Group's quarterly earnings calls are defective on their face and cannot save the Amended Complaint from dismissal under PSLRA and Rule 9(b).

### 3. The GEO Group's Disclosures Are Fatal To Plaintiffs' Misrepresentations and Omission Claims.

Plaintiffs' claims of fraudulent misrepresentation and omission are also defective and fail to state a claim under Section 10(b) and Rule 10b-5 as a direct consequence of the GEO Group's ample risk disclosures in its public filings.

As detailed above, the GEO Group's annual SEC Form 10-K filings during the Putative Class Period contained detailed risk disclosures and cautionary statements that fully and adequately warned of the potential adverse effects on its financial condition, operations and stock price. These disclosures go to the very heart of the Plaintiffs' fraudulent omission claims, as the GEO Group's public SEC filings explicitly disclosed: (i) the potential termination and loss of the Company's private correctional facility governmental contracts; (ii) the Company's revenue dependency on a limited number of governmental clients; and (iii) the Company's potential failure to comply with extensive government regulations and applicable contractual requirements and the potential resulting loss of its contracts. *See, e.g.,* Exhibit 1, 2015 10-K, pp. 32-34, 36.

Indeed, the GEO Group's annual SEC filings even disclosed that "*changes in the prospects of public-private partnerships in the corrections and detention industry*" could adversely affect the market price of the Company's common stock. *See* Exhibit 1, 2015 10-K, p. 44. Try as they might, Plaintiffs cannot evade the fact that the GEO Group adequately disclosed the *very same risk* that forms the basis for this strike suit, *i.e.*, a sharp drop in the Company's stock price caused solely by the DOJ's change in policy concerning its public-private partnerships with private correctional facility contractors like the GEO Group. Needless to say, these disclosures are fatal to all of Plaintiffs' claims since it is axiomatic that "[a] Plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116–17 (2d Cir. 1982).

### 4.   Plaintiffs Fail To Plead A Strong Inference of Scienter.

Plaintiffs' facially defective securities fraud claims must be dismissed for another fundamental reason: the Amended Complaint fails to plead facts sufficient to support *any* inference of scienter, much less the strong inference required by the PSLRA.

### (a)  The Amended Complaint Fails To Allege Facts Supporting Scienter.

The element of scienter necessary to state a claim under Section 10(b) and Rule 10b-5 required Plaintiffs to assert particularized allegations that *each defendant* acted knowingly or in a severely reckless manner. *See Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1323 (S.D.

Fla. 2004).  "Severe recklessness" – the minimum that must be plead – "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care [such that] . . . the defendant must have been aware of [the fraud]."  *Ziemba*, 256 F.3d at 1202.

As the Supreme Court held in *Tellabs,* to survive dismissal a complaint must allege facts sufficient to make the inference of scienter "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  551 U.S. at 314.  To determine whether a complaint's scienter allegations are sufficient, a court "must engage in a comparative evaluation; it must consider, not only inferences urged by the Plaintiffs . . . but also competing inferences rationally drawn from the facts alleged."  *Id.*

Here, the Plaintiffs' scienter allegations consist of threadbare conclusions that (i) "[b]y virtue of their positions at GEO," the individual Defendants had actual knowledge of the alleged materially misleading statements and material omissions or, in the alternative, acted with reckless disregard for the truth, (ii) "Defendants were personally motivated to omit material information necessary to make the statements not misleading in order to personally benefit from the sale of GEO securities from their personal portfolios"; and (iii) "[a]s the senior managers and/or directors of GEO, the Individual Defendants had knowledge of the details of GEO's internal affairs."  Amended Compl., ¶¶159, 160, 161.

Plaintiffs' paltry scienter allegations are insufficient under the stringent PSLRA and *Tellabs* standard.  The Eleventh Circuit has consistently admonished that barren allegations of "motive and opportunity" – exactly like those asserted in Plaintiffs' Amended Complaint – are inadequate to support a strong inference of scienter.  *See, e.g., Bryant*, 187 F.3d at 1285 ("[W]e reject the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter in this Circuit.").  Indeed, "mere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter."  *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1286 (S.D. Fla. 2008); *see also In re: Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1324 (M.D. Fla. 2002) ("In essence, the Amended Complaint

merely alleges that these Defendants 'must have known' because of the CEO and CFO positions that they held, and such pleading does not pass muster under the PSLRA.").

Plaintiffs' Amended Complaint merely parrots these same generalized scienter allegations that this Court and the Eleventh Circuit have repeatedly found lacking, and fails to provide a scintilla of factual support for any claim that the GEO Group or any of its officers (including specifically the individual Defendants) had knowledge of any alleged fraud. Furthermore, the Company's detailed forward-looking public risk disclosures discussed above – which address the very same matters Plaintiffs allege the GEO Group purportedly concealed – negates any inference of scienter. Plaintiffs' glaring failure to plead any facts supporting a strong inference of scienter requires dismissal of the Amended Complaint.

> **(b)** **Plaintiffs' Confidential Witness Allegations Do Not Support A Strong Inference of Scienter and Should Be Given No Weight.**

In a transparent, albeit unsuccessful, attempt to shore up the Amended Complaint's defective scienter allegations, Plaintiffs seek to rely upon the statements of "confidential" witnesses who were formerly employed by the GEO Group. Amended Compl., ¶¶54-65. Taken as a whole, Plaintiffs' confidential witness allegations assert that the GEO Group's executive officers received regular reports of subpar conditions and non-compliance with BOP management contracts at the Company's correctional facilities, but failed to either correct these alleged problems or publicly disclose their existence. *Id.* These statements either do not support a strong inference of scienter in this case or are entitled to no credence because the Amended Complaint fails to include the critical particulars that the PSLRA requires of confidential witness allegations. As the Eleventh Circuit has held:

> [T]he weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008).

Equally important, Plaintiffs are required to flesh out the specific details – including the ***actual content*** – of any alleged reports, meetings or conferences asserted by their confidential

witnesses. "Simply put, courts remain 'skeptical' of confidential sources who, from behind the veil of anonymity, provide only non-specific descriptions of meetings and internal documents." *Mogensen v. Body Central Corporation*, 15 F. Supp. 3d 1191 (M.D. Fla. 2014).[4]  The *Mogensen* decision succinctly explains why Plaintiffs' confidential witness allegations in this case are insufficient.  The plaintiff in *Mogensen* – much like the Plaintiffs here – sought to establish scienter based on confidential witness statements that the defendants' executive management received weekly conference calls and sales reports disclosing the problems that the company allegedly concealed.  The court rejected the plaintiff's confidential witness allegations, and held:

> [W]ithout any detail of what these reports contained, this cannot support an inference of scienter.  Otherwise, any executives working at a company with an internal reporting system would work at their peril.  To impute knowledge of or extremely reckless disregard for the truth from the mere existence of an internal reporting system, and the mere active engagement of management, would allow almost any securities fraud case to proceed into discovery.  These are precisely the types of vague allegations that the PSLRA was meant to curtail. . . .  In sum, this Court cannot draw a strong inference of scienter from the confidential witnesses' nonparticularized descriptions of conference calls and internal reports.

15 F. Supp. 3d at 1220-1221.

When analyzed under these exacting standards, it is clear that none of the following confidential witness statements are sufficient to plead or establish a strong inference of scienter:

(i)  <u>Confidential Witness 1 ("CW1")</u>:  CW1 was a Vice President of Contract Compliance at the GEO Group's Boca Raton, Florida headquarters for a brief twelve-month period until he was terminated for unsatisfactory performance.  CW1's statements, which amount to nothing more than unsubstantiated opinions regarding the GEO Group's business practices, are not indicative of scienter which requires specific factual allegations showing that the Defendants shared these opinions.

---

[4]   *See also Cole v. Health Management Associates, Inc.*, 2009 WL 2713178, at *9 (M.D. Fla. July 17, 2009) (mere existence of internal reports insufficient to infer scienter, as plaintiff must provide details, including actual content, of reports); *Royal Caribbean*, 2013 WL 3295951, at *18 (holding "the Complaint lacks any specificity as to what was in the reports, whether they concerned the company as a whole or simply one region, or whether the reports were considered in issuing the relevant guidance."); *Waterford Township Gen. Employees Retirement Sys. v. BankUnited Financial Corp.*, 2010 WL 1332574, at *14 (S.D. Fla. Mar. 30, 2010) (generalized allegation, without providing specific information, that weekly meetings discussed profit trends and their impact on public disclosures cannot support any inference of scienter); *Fidel v. Rampell*, 2005 WL 5587454, at *4, *7 (S.D. Fla. Mar. 29, 2005) (complaint failed to allege that defendants were directly told specific information that contradicted their public disclosures).

Plaintiffs also fail to describe the foundation or basis of CW1's alleged knowledge. *See Royal Caribbean*, 2013 WL 3295951, at *18 (allegations must unambiguously provide "in a cognizable and detailed way" the basis of the witnesses' knowledge). CW1's false claim that the GEO Group was alerted to "at least 4-14 contract violations per week" likewise carries no weight because Plaintiffs fail to flesh out *any* of the details of these alleged contract violations. More to the point, *none* of the alleged vague and unspecific reports of contract violations provides any basis for the Plaintiffs' scienter allegations, *i.e.*, that Defendants had knowledge – but intentionally failed to disclose to the company's shareholders – that such reports would likely result in the DOJ's abrupt shift in policy regarding the use of private correctional facilities.

(ii)  <u>Confidential Witness 2 ("CW2")</u>:  CW2 is a former warden at the GEO Group's Rivers Correctional Institution in North Carolina.  By dint of his location and limited field of responsibility for a single facility, CW2 had no proximity – either geographically or within the GEO Group's organization – to Defendants' alleged conduct on issues relating to contract compliance.  Moreover, CW2 does not provide any facts whatsoever regarding the  "major events" he claims were promptly reported to Defendants.  CW2's statements regarding Defendant Zoley's periodic visits to the Company's facilities are also insufficient to establish scienter because they fail to show with any particularly what alleged contract violations were supposedly brought to Mr. Zoley's attention.  CW2's comment regarding the *potential* closure of a GEO Group facility is likewise a complete non-starter, as he does not even claim that the potential closure resulted from alleged contract violations (as opposed to budget constraints or other plausible, non-fraudulent inferences).

(iii)  <u>Confidential Witness 3 ("CW3")</u>:  CW3, a former Corrections Officer in Texas, offers his mere opinion that BOP correctional facilities were more secure than the GEO Group's facilities and that the Company failed to follow certain BOP guidelines.  CW3 also offers rank hearsay of "talk" that the DOJ would revoke private prison contracts before renewal based on "safety, security and budget" factors," and that the Company was given advance notice of annual accreditation audits by the ACA.  The statements attributed to CW3 should be discarded and given no weight at all, as Plaintiffs fail to describe the foundation or basis of CW3's knowledge or explain how his statements support a strong inference of scienter on the part of Defendants.

(iv)  <u>Confidential Witness 4 ("CW4")</u>:  CW4 is a former Director of Contract Compliance who was terminated for committing expense report fraud.  CW4's contention that the GEO Group has an internal reporting system whereby the Company's employees conduct ongoing audits of its private correctional facilities and compile monthly reports in an effort to ensure compliance with BOP contracts is in fact entirely consistent with the Company's SEC filings.  *See* Amended Compl., ¶¶ 68.   Conversely, CW4's statements that these reports and other unspecified "problems" at the facilities were brought to the attention of Defendants Zoley and Evans at monthly board meetings must be disregarded out of hand, because they fail to flesh out *any* of the details or content of the alleged reports or meetings.  *See Mogensen; Royal Caribbean*, *supra*.

(v)  <u>Confidential Witness 5 ("CW5")</u>:   CW5, a former Regional Human Resources Specialist in North Carolina, simply avers that the Company's facilities were subject to monthly audits and reporting by legal or contract compliance personnel; that Defendant Zoley met with correctional facility wardens at an annual conference; and that turnover of guards in the facilities was high as a result of "poor working conditions."  CW5's statements must be given no weight, as she fails to identify any facts describing the foundation for her knowledge, and further fails – just like CW1, CW2 and CW4 – to provide any particularized details or the *actual content* of any of the audits, reports, or meetings that she vaguely describes.  *Id.*

(vi)  <u>Confidential Witness 6 ("CW6")</u>:   CW6, a former Proposal Coordinator at the GEO Group's Boca Raton headquarters, offers nothing more than a hearsay statement that one of the Company's business directors opined that private prison companies could be "losing business soon."   Needless to say, this alleged vague, unspecified and unsubstantiated verbal comment does not remotely assist Plaintiffs in meeting their burden of establishing scienter.

(vii)  <u>Confidential Witness 7 ("CW7")</u>:  CW7's statements consist solely of an opinion that the GEO Group maximized profits by intentionally keeping staffing levels below those required to run one specific facility "optimally."   Plaintiffs make no attempt to explain how these generalized statements establish the Defendants' knowledge that the GEO Group's challenged public statements were in any way false or misleading.  Further, CW7 does not claim – and could

not possess by virtue of her distant proximity to the Company's headquarters – any actual knowledge of the GEO Group's business strategies with respect to staffing its private correctional facilities.

(viii)   Confidential Witness 8 ("CW8"):   CW8, a former Risk Management Claims Assistant, states that the GEO Group's correctional officers were injured at a rate far higher than at public correctional facilities; that injured employees complained about understaffing; and that the GEO Group sought to deny legitimate injured worker claims.  None of CW8's statements are entitled to any weight, since Plaintiffs do not allege any facts describing the basis for CW8's knowledge, and the statements do not establish that Defendants misrepresented or concealed the existence or extent of workplace injuries in any of the challenged public statements, or that this caused the decline in the federal prison population that led to the DOJ's Memorandum.

(ix)   Confidential Witness 9 ("CW9"):  Plaintiffs offer CW9, a Records Analyst at the GEO Group's headquarters for less than a year, for the unremarkable statement that the Company's executives were always sensitive to the possibility of losing contracts and constantly focused on contract compliance.  Once again, Plaintiffs fail to remotely establish how CW9's statements give rise to any inference of scienter, much less the requisite strong inference of scienter.

In sum, **none** of the Plaintiffs' confidential witnesses provide any ***facts*** evidencing the Defendants' knowledge or reckless disregard of information contradicting the GEO Group's public statements, much less any evidence the Defendants were aware of – but failed to disclose – the risk that the DOJ would abruptly change its policy regarding private correctional facilities.

### 5.   Plaintiffs' Claims Are Based On Non-Actionable Forward-Looking, Cautionary Statements.

Plaintiffs' fraud claims are also barred because the alleged misrepresentations at issue are clearly protected forward-looking statements entitled to "Safe Harbor" under the PSLRA.

In an effort to insulate public companies from potential liability for forward-looking statements and to encourage management to share opinions and projections, Congress included in the PSLRA a safe harbor that insulates corporate managers from liability for forward-looking statements.  15 U.S.C. § 78u-5.  As a result, there is no liability for forward looking statements when the statements are identified as such and are "accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement[s]." 15 U.S.C. § 78u-5(c)(1)(A)(i). Where the alleged fraud is grounded on forward looking statements, dismissal is required regardless of the state of mind of the person who made the statement, be it negligent, reckless, or even knowing. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010).

Here, the GEO Group's annual 10-K filings for the entire Putative Class Period included a conspicuous section entitled "**Forward-Looking Statements — Safe Harbor**" that warned its shareholders that each 10-K contained "forward-looking" statements within the safe harbor, including "statements regarding our future financial position, business strategy, budgets, projected costs and plans and objectives of management for future operations," and that "[t]hese statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions, which are difficult to predict." *See* Exhibit 1, 2015 10-K, p. 79 (disclosing that "forward-looking" statements generally can be identified by the use of forward-looking terminology such as "expect" or "believe"); *see also* Exhibit 4, 2011 10-K at p. 82-83; Exhibit 5, 2012 10-K at p. 69-70; Exhibit 6, 2013 10-K at p. 83-84; Exhibit 7, 2014 10-K at p. 84-85.

The alleged misrepresentations underlying Plaintiffs' fraud claims – *i.e.*, that the GEO Group *"expected"* to continue to derive a significant portion of its revenues from a limited number of governmental agencies and that it *"believed"* its long-term customer relationships would enhance its ability to attract and retain existing business – are the epitome of non-actionable forward-looking statements that fall squarely within the safe harbor of the PSLRA. *See, e.g.,* Amended Compl., ¶¶67-68. And in fact, the GEO Group Form 10-K filings repeatedly and explicitly identified the *exact* statements that form the core of Plaintiffs' securities fraud claims as forward-looking cautionary statements that the Company could neither guarantee nor predict. For instance, the GEO Group's 2015 10-K identified its forward-looking, "cautionary statements" as including statements about (i) "our ability to win management contracts for which we have submitted proposals, *retain existing management contracts* and *meet any performance standards required by such management contracts*;" (ii) "our ability to estimate the government's level of dependency on privatized correctional services;" and (iii) "*our ability to*

*comply with government regulations and applicable contractual requirements*." *See* Exhibit 1, pp. 79-80 (emphasis added).

Suffice it to say, these emphatic forward-looking, cautionary statements eviscerate Plaintiffs' allegations of fraudulent misrepresentation and omission. Plaintiffs' self-serving addition of a boilerplate paragraph to the Amended Complaint generally denying the forward-looking nature of the GEO Group's public statements does not alter this analysis. *See* Amended Compl., ¶138. Plaintiffs predictably claim that Defendants are not entitled to assert or rely upon the "Safe Harbor" provisions of PSLRA by falsely claiming that the statements at issue were not identified as "forward-looking," that the GEO Group failed to accompany such statements with meaningful cautionary statements, and that the GEO Group is liable nevertheless because the particular speaker at issue knew the statement was misleading or the statement was authorized or approved by a GEO Group executive officer with knowledge of the statements falsity. *Id.*

Much like the rest of their Amended Complaint, Plaintiffs' challenge to the application of the PSLRA's "Safe-Harbor" is not only completely devoid of any actual supporting *facts*, but also disregards the explicitly labeled forward-looking statements, risk disclosures and cautionary statements contained in all of the GEO Group's public filings that directly contradict and refute each of the Plaintiffs' claims of misrepresentation and omission. *See* infra, Section C, pp. 8-12.

### 6. Plaintiffs Have Failed to Sufficiently Plead Loss Causation.

The Amended Complaint finally must be dismissed for failure to plead "loss causation," *i.e.*, that Plaintiffs' alleged economic loss was caused by the GEO Group's "fraud."

A plaintiff asserting Section 10(b) and Rule 10b-5 claims is required to sufficiently allege a causal connection between the alleged misrepresentations and the economic loss incurred. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005); *see also* 15 U.S.C. §78u-4(b)(4); *Robbins v. Koger Prop., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997). Even in a fraud-on-the-market case like this one, "the Plaintiffs must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the Plaintiffs' purchase price was subsequently removed from the stock's price, thereby causing losses to the Plaintiffs.'" *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013).

Plaintiffs fail to make such a showing of proximate cause, nor can they given the truthful nature of the GEO Group's alleged misrepresentations and the vast risk disclosures contained in its public SEC filings.  There is no connection between the GEO Group's alleged fraudulent statements and omissions, and the abrupt drop in the Company's stock price given its frequent public disclosures regarding the potential adverse consequences resulting from a change in the U.S. Government's policy on the use of private correctional facilities.  Indeed, throughout the entire putative Class Period, the GEO Group specifically warned its shareholders that it derived significant revenue from limited governmental clients, and could be adversely affected in the event those clients decided to terminate or non-renew its contracts with the Company.  Even more damning to Plaintiffs' loss causation claims, the GEO Group explicitly and repeatedly warned its shareholders that the Company's facility contracts were subject to "extensive government regulation and applicable contractual requirements" and that the GEO Group's failure or inability to comply with these regulations and contractual requirements could result in *the non-renewal or termination of facility management contracts. See, e.g.,* Exhibit 1, p. 36.

In short, the drop in the GEO Group's share price on August 18, 2016 was undoubtedly caused solely by the DOJ's announcement of its change in policy regarding its future use of private correctional facilities, and not by the revelation of any alleged "fraud" by Defendants.

## CONCLUSION

For all of the foregoing reasons, The GEO Group respectfully request that Plaintiffs' Amended Class Action Complaint be dismissed in its entirety, and with prejudice.[5]

---

[5]  The Amended Complaint is effectively Plaintiffs' second bite at the apple, thus justifying a dismissal with prejudice. *Bay v. Palmisano*, No. 01-0949, 2002 WL 31415713, at *11 (E.D. La. Oct. 24, 2002) (denying request for leave to amend first consolidated complaint and dismissing with prejudice).  Plaintiffs' experienced counsel cannot claim that they prepared the Amended Complaint while unaware of either the pleading standards under Rule 10b-5 and the PSLRA, or the wide-ranging deficiencies identified in the GEO Group's Motion to Dismiss the original Complaint.  As such, Plaintiffs – who abandoned the facially defective allegations of the original "place holder" Complaint in favor of the virtually identical allegations found in the Amended Complaint – "have already had more than one bite at the apple." Any further amendment would be futile and would subject the GEO Group to undue delay, expense and prejudice.  *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 700 (6th Cir. 2004) ("[T]he purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA"); *Harris*, 182 F.3d at 807-08 (affirming dismissal securities class action and denial of leave to amend); *In re Royal Caribbean*, 2013 WL 3295951, at *19 (denying leave to amend where further amendment would be futile).

Respectfully submitted,

**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL  33131
Telephone: (305) 374-5600
Facsimile: (305) 374-5095

By: _/s/ Brian P. Miller_____
    Brian P. Miller, Esq.
    Florida Bar No. 0980633
    brian.miller@akerman.com
    Samantha J. Kavanaugh, Esq.
    Florida Bar No. 0194662
    samantha.kavanaugh@akerman.com
    Jonathan B. Butler, Esq.
    Florida Bar No. 056197
    jonathan.butler@akerman.com
    Ross E. Linzer, Esq.
    Florida Bar No. 073094
    ross.linzer@akerman.com

*Counsel for Defendant The GEO Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of January, 2017, I electronically filed the foregoing document with the clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

Jayne A. Goldstein, Esq.
jgoldstein@sfmslaw.com
Shepherd, Finkelman, Miller & Shah, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326

Tamar A. Weinrib, Esq.
taweinrib@pomlaw.com
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016

Patrick V. Dahlstrom, Esq.
pdahlstrom@pomlaw.com
POMERANTZ LLP
10 South La Salle Street, Suite 3505
Chicago, IL 60603

Peretz Bronstein
peretz@bgandg.com
BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, NY 10165

*Counsel for Plaintiffs*

George S. LeMieux, Esq.
glemieux@gunster.com
jbuck@gunster.com
eservice@gunster.com
Jennifer B. Nicole, Esq.
jnicole@gunster.com
gwilkerson@gunster.com
eservice@gunster.com
Gunster, Yoakley, & Stewart, P.A.
450 East Las Olas Blvd., Suite 1400
Fort Lauderdale, FL 33301

William Hill, Esq.
whill@gunster.com
mchase@gunster.com
eservice@gunster.com
Gunster, Yoakley, & Stewart, P.A.
600 Brickell Avenue, Suite 3500
Miami, FL 33131

*Counsel for Defendants George C. Zoley,
Brian R. Evans, John Hurley and David
Donahue*

By: */s/ Brian P. Miller*
     Brian P. Miller, Esq.

{40435048;1}