**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 16-cv-81494-MIDDLEBROOKS**

JOHN J. MULVANEY, and JOSEPH WILLIAM OLDKNOW, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

THE GEO GROUP, INC., GEORGE C. ZOLEY, BRIAN R. EVANS, JOHN HURLEY, and DAVID DONAHUE,

Defendants.
_______________________________________/

**ORDER GRANTING MOTIONS TO DISMISS**

This cause comes before the Court on multiple Motions to Dismiss the Amended Complaint. On January 13, 2017, Defendant The GEO Group, Inc. ("GEO Group") filed its Motion to Dismiss (DE 65), as did Defendants George C. Zoley, Brian R. Evans, John Hurley, and David Donahue (the "Individual Defendants") (DE 66). On January 27, 2017, Lead Plaintiffs Brian A. Hellings and the Ann Hellings 2012 Trust ("Plaintiffs") filed a Response to the Motions to Dismiss. (DE 69). On February 10, 2017, GEO Group filed a Reply (DE 73), as did the Individual Defendants (DE 74).

## I. BACKGROUND

**Parties.** According to the Amended Complaint, GEO Group, a Florida corporation headquartered in Boca Raton, Florida, provides government-outsourced services, specializing in the management of correctional, detention, and re-entry facilities in the United States, Australia, South Africa, the United Kingdom, and Canada. (Am. Compl. ¶¶ 3, 20). Defendant George C. Zoley ("Zoley") served as GEO Group's Chairman and Chief Executive Officer ("CEO") at all relevant times in the Amended Complaint. (*Id.* ¶ 21). Defendant Brian R. Evans ("Evans") was GEO

Group's Chief Financial Officer ("CFO") and Senior Vice President ("VP") at all relevant times. (*Id.* ¶ 22). Defendant John Hurley ("Hurley") served as Senior VP of Operations and President of GEO Corrections and Detentions at all relevant times until February 2016. (*Id.* ¶ 23). Defendant David Donahue ("Donahue") became President of GEO Corrections and Detentions in February 2016, and has since held that position. (*Id.* ¶ 24).

Plaintiffs acquired GEO Group securities between March 1, 2012 and August 17, 2016 (the "Class Period"). (*Id.* ¶ 1).

**GEO Group's BOP Contracts.** The Amended Complaint relates to GEO Group's contracts with the Federal Bureau of Prisons ("BOP"), an arm of the Department of Justice ("DOJ"), to run Criminal Alien Requirement ("CAR") prisons, which confine criminal alien adult males. (*Id.* ¶¶ 3, 26). The BOP contracts require GEO Group to comply with applicable laws and regulations and follow a number of BOP policies, which are defined in the contracts. (*Id.* ¶ 30).

**Conditions in Private Prisons.** According to the Amended Complaint, GEO Group's prisons were "plagued" by inadequate conditions, "often in direct disregard for BOP and other contractual policies and guidelines." (*Id.* ¶ 53).

On August 11, 2016, the DOJ Office of the Inspector General ("OIG") published a Review of the BOP's Monitoring of Contract Prisons from 2011 to 2014 (the "2016 OIG Report" or "Report"), which found that contractor prisons had more "safety and security incidents per capita than comparable BOP institutions," and "more frequent incidents per capita of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances." (*Id.* ¶¶ 127, 130). The 2016 OIG Report found that GEO Group's contract prisons had more incidents per capita than those of the BOP's other two private contractors

"for contraband finds, several types of reports of incidents, lockdowns, guilty findings on inmate discipline charges, positive drug test results, and sexual misconduct." (*Id.* ¶ 130).

The 2016 OIG Report noted specific problems in four of the prisons for which GEO Group provides services. Rivers Correctional Institution ("Rivers") and D. Ray James Correctional Institution ("D. Ray"), which GEO Group operates, were two of three contract prisons that "most often had more incidents per capita in the categories of data we analyzed." (*Id.* ¶ 130). The Report stated that D. Ray accounted for 29 percent of the assaults on staff in all contract prisons from 2011 through 2014, and that a D. Ray employee told OIG that the prison "was having significant performance issues on its contract during this period and that the BOP had issued a cure notice in the fall of 2012," and 47 notices of concern in 2012. (*Id.* ¶ 130). The employee explained that a cure notice is issued to a contract prison that is not meeting the vital functions of its contract and indicates that the BOP is on the brink of ending the contract. (*Id.* ¶ 130). The Report also noted that "disturbances in several contract prisons have resulted in extensive property damage, bodily injury, and the death of a Correctional Officer," citing a December 2008 riot at the Reeves County Detention Center ("Reeves"), for which GEO Group provides managers, and a February 2011 assault at the Big Springs Correctional Center ("Big Springs"), which GEO Group operates. (*Id.* ¶¶ 33, 34, 128, 129). The Report stated that the first disturbance was affected by low staffing and the second disturbance was partially caused by inmate dissatisfaction with the staff's response to a medical emergency. (*Id.* ¶ 34).

The OIG Report also cited a 2015 audit of the Reeves facility (the "Reeves Audit"), which found that "the contractor" had failed to comply with contractual requirements in the areas of billing and payment, correctional and health services staffing, and internal quality control, and that Reeves contained an isolation unit that lacked specific policies to ensure inmate rights. (*Id.* ¶ 34). The

Audit found that Reeves' medical contractor, Correctional Healthcare Companies ("CHC"), had failed to meet contractual staffing obligations in the medical unit for at least 34 of the 37 months from 2010 to 2013. (*Id.* ¶ 52).

According to the Amended Complaint, BOP oversight "had little effect" on conditions. (*Id.* ¶ 42). Reports issued by BOP inspectors (the "BOP Reports") cited deficiencies in the healthcare at GEO's prisons for years. (*Id.* ¶ 42). Before the start of the Class Period, the head of BOP's Privatization Management Branch wrote in an email that BOP inspectors "have identified serious issues in health care – specifically their infectious disease program."[1] (*Id.* ¶ 42). At one point, the BOP considered not renewing its contract with Reeves County, noting 230 citations and $2 million in penalties for compliance failures at the Reeves facility, as well as a lack of healthcare that has "greatly impacted inmate health and well-being." (*Id.* ¶ 42). The BOP Reports were not made public during the Class Period. (*Id.* ¶ 42).

Immigrant advocates also documented conditions in GEO Group's prisons. (*Id.* ¶ 35). An article written by Seth Freed Wessler for *The Nation* (the "Wessler Article") documented multiple accounts of prisoners at GEO Group's prisons receiving substandard medical care.[2] (*Id.* ¶¶ 36-37). A report drafted by the American Civil Liberties Union ("ACLU") in June 2014 (the "ACLU Report") documents conditions at Reeves and Big Springs. (*Id.* ¶ 44). The ACLU Report states that prisoners were punished for a protest in 2013, and documents instances of medical neglect, the use of isolation cells in contravention of BOP policy, and overcrowded conditions. (*Id.* ¶ 46). The ACLU Report also states that "BOP's own monitors have found numerous deficiencies that could

---

[1] The Amended Complaint does not identify whose infectious disease program the email was referring to.

[2] It is unclear when the Wessler Article was published. The Amended Complaint states that it was written earlier in 2016, and "updated following the DOJ's August 18, 2016 announcement." (*Id.* ¶ 36).

let them out of contract – expressing frustration in 2010 that GEO Group 'shows little signs of improvement' and 'is unable to successfully achieve their own plans of action to correct deficient areas.'" (*Id.* ¶ 46).

In addition, multiple inmates in GEO Group's facilities have filed lawsuits based on poor conditions. (*Id.* ¶ 18). The Amended Complaint cites at least two such lawsuits in 2014 and one in 2015. (*Id.* ¶ 18).

A number of confidential witnesses, who worked for GEO Group, commented on low staffing levels, disciplinary issues, security issues, and poor working conditions. (*Id.* ¶ 54, 58, 61, 64).

**Defendants' Awareness of Prison Conditions.** The Amended Complaint alleges that the Individual Defendants were aware of the inadequate conditions in GEO Group's prisons by virtue of their positions of power, BOP monitoring, GEO Group's internal reporting structure, and prisoner lawsuits. (*Id.* ¶¶ 3, 159). The Individual Defendants were motivated to omit this information in public statements in order to benefit from the sale of GEO Group securities from their personal portfolios. (*Id.* ¶ 160).

Confidential witnesses explained the internal reporting structure. A warden at the Rivers facility from July 2009 to July 2012 stated that each GEO Group facility reported "information" to corporate headquarters daily, with "major events" reported within as little as three minutes. (*Id.* ¶ 55). The warden stated that when a "major event" occurred, "I would call my boss who would call [Defendant] John Hurley who would walk into [Defendant] Zoley's office and tell him." (*Id.* ¶ 55). The warden also stated that Zoley visited GEO Group's facilities a few times a year, at which times he received a 15 minute presentation on "what was going wrong and right." (*Id.* ¶ 56).

A director of contract compliance at GEO Group's headquarters from 2010 to 2012 stated that each facility had an employee who audited the facility for compliance with BOP contracts. (*Id.* ¶ 60). The director said that the audit employees sent their results to headquarters, where compliance directors compiled monthly reports based on the information they received, and distributed them to the GEO Group's executives. (*Id.* ¶ 60). The director also stated that problems at the facilities were brought to the attention of executives during monthly board meetings, attended by Zoley and Evans. (*Id.* ¶ 60).

A regional human resources specialist from March 2011 to May 2015 stated that each facility received a monthly visit from someone in legal or contract compliance at GEO Group's corporate office. The human resources specialist said that Zoley met with the wardens of each of GEO Group's facilities at an annual conference each year. (*Id.* ¶ 61).

Confidential witnesses also stated that GEO Group was aware that its BOP contracts were at risk. A correctional officer at Big Springs from May 2013 to February 2014 stated that there was talk that the DOJ would revoke private prison contracts before renewal, explaining that "safety, security and budget were all factors." (*Id.* ¶ 58). A proposal coordinator at headquarters from November 2013 to May 2015 said that Zoley's son-in-law told him that private prison companies could be "losing business soon." (*Id.* ¶ 62).

**Materially Misleading Statements.** The Amended Complaint alleges that throughout the Class Period, Defendants issued materially misleading statements in GEO Group's 10-K and 10-Q filings, and in earnings calls, touting their relationship with the BOP.[3] (*Id.* ¶ 4). Plaintiffs allege that having opted to speak about the BOP contracts, Defendants were duty bound to disclose that: (i) GEO Group's private facilities lacked adequate safety and security standards, and were less

[3] The Individual Defendants certified the accuracy of various SEC filings, pursuant to the Sarbanes-Oxley Act of 2002, and also spoke during various earnings calls.

efficient than BOP facilities; (ii) GEO Group's private facilities often failed to adhere to the contractual obligations; (iii) a significant risk existed that the DOJ would recommend phasing out BOP's contracts with GEO; and (iv) consequently, a risk also existed that other governmental agencies would similarly choose to investigate GEO Group's private prisons. (*Id.* ¶ 4).

The Amended Complaint alleges that multiple misleading statements were made about GEO Group's contracts and revenue. In 10-K filings and earnings calls, the Individual Defendants advised investors that: "We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies." (*Id.* ¶¶ 67, 77, 91, 103, 104, 116). Following these statements, GEO Group repeatedly mentioned that around 40% of its revenues came from BOP, Immigration and Customs Enforcement ("ICE"), and U.S. Marshals Service contracts, and that GEO Group had worked with various governments for approximately 25 years. (*Id.* ¶¶ 67, 68, 77, 91, 103, 104, 116, 117). In GEO Group's 10-Q filings, the Individual Defendants announced GEO Group's financial and operating results for each relevant quarter. (*Id.* ¶¶ 70-75, 81-82, 85, 87-88, 94-95, 97-98, 100-101, 107-108, 113-114. 121, 122-124).

GEO Group repeatedly announced new contracts with BOP and expected revenues from those contracts, as well as bid opportunities that GEO Group was pursuing. (*Id.* ¶¶ 102, 106, 112, 115, 119, 122). On an August 4, 2015 earnings call, Zoley stated: "As we look into the third quarter, we have several reasons to be optimistic," citing that GEO Group had several new BOP contracts, and had submitted proposals for other BOP contracts. (*Id.* ¶ 109). On a May 8, 2013 earnings call, Zoley stated: "[W]e are currently participating in nonpublic procurements in California and Michigan and at the federal level, which are expected to have contract awards and may result in the reactivation of several of our idle facilities later this year." (*Id.* ¶ 80).

In 10-K filings and earnings calls, the Individual Defendants also listed GEO Group's various accreditations, and stated: "We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract." (*Id.* ¶¶ 68, 77, 91, 103, 104, 117).

The Amended Complaint alleges that GEO Group misleadingly projected optimism about future contracts based on the strength of its BOP relationships. In its 10-K filings, GEO Group stated: "We have developed long-term relationships with our federal, state and other governmental customers, which we believe enhance our ability to win new contracts and retain existing business." (*Id.* ¶¶ 68, 77, 91, 103, 104). On multiple earnings calls, Hurley and Zoley stated: "We have long-standing partnerships with the Federal Bureau of Prisons, the United States Marshals Service and the United States Immigration and Customs Enforcement or ICE. And we provide cost-effective solutions for them at a number of facilities across the country. We continue to see meaningful opportunity for us to partner with all 3 of these federal agencies, notwithstanding the various issues with the federal budget." (*Id.* ¶ 76, 80, 83, 86, 89, 93, 96, 99, 102, 106, 109, 112). On a February 17, 2016 earnings call, Zoley stated: "We are very pleased with our strong fourth quarter results and our outlook for 2016 which reflect the continued organic growth of our diversified business segments of GEO Corrections & Detention and GEO Care." (*Id.* ¶ 115). On an April 28, 2016 earnings call, Donahue stated: "We believe that our unique platform of correctional and rehabilitation services better positions GEO to capture future growth, which will enhance value for our shareholders and allow us to continue to grow our earnings, cash flows and dividend payments." (*Id.* at 119). On an August 2, 2016 earnings call, Donahue stated: "[W]e are optimistic that our projects will be reviewed favorably for continued use. We have a very good relationship with the Bureau of Prisons and our seven facilities with the 15,000 beds operational performances at the

appropriate levels and exceeding our expectations and the client's expectations. So we have no reason to believe that they the client will not view them appropriately on a going forward basis." (*Id.* ¶ 122).

**The Stock Drop.** The 2016 OIG Report, discussed above, was published on August 11, 2016. (*Id.* ¶ 126). GEO Group's written response to the Report, dated August 9, 2016 and signed by Zoley, was published as Appendix 9 to the Report. (*Id.* ¶ 131).

On August 18, 2016, the DOJ sent a memorandum ("DOJ Memo") to the Acting Director of the BOP asking him to "begin[] the process of reducing – and ultimately ending – our use of privately operated prisons." (*Id.* ¶ 132). The DOJ Memo stated:

> Private prisons served an important role during a difficult period, but time has shown that they compare poorly to our own Bureau facilities. They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security.

(*Id.* ¶ 132). The same day that the DOJ issued its Memo, GEO Group's share price fell $12.78, or 39.58%, to close at $19.51. (*Id.* ¶ 133).

On August 29, 2016, the Department of Homeland Security ("DHS") released a statement that it had established a subcommittee to determine whether it should eliminate its use of private immigration detention facilities. (*Id.* ¶ 134). On December 1, 2016, the Homeland Security Advisory Council voted to shift away from using private contractors for its detention facilities. (*Id.* ¶ 137). Contracts with the ICE division of DHS account for 35% of GEO Group's total revenue from government contracts since 2008. (*Id.* ¶ 137).

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is

bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe plaintiff's complaint in the light most favorable to plaintiff and take the factual allegations stated therein as true. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purpose of determining whether a claim is legally sufficient).

Generally, a plaintiff is not required to detail all of the facts upon which he bases his claim. Fed. R. Civ. P. 8(a)(2). Rather, Rule 8(a)(2) requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds. *Twombly*, 550 U.S. at 555-56. However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. Plaintiff's "obligation to provide the 'grounds'

of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). "Factual allegations must be enough to raise [plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Id.*

Private securities fraud claims are subject to a heightened pleading standard. "To survive a motion to dismiss, a claim brought under [§ 10(b) and] Rule 10b-5 must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in Federal Rule of Civil Procedure 9(b); and (3) the additional pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

Under Rule 9(b), the complaint must "set[] forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)). "A sufficient level of factual support for a 10b claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks and citations omitted).

"The PSLRA imposes additional heightened pleading requirements on Rule 10b-5 actions." *FindWhat*, 658 F.3d at 1296. "For Rule 10b-5 claims predicated on allegedly false or misleading

statements or omissions, the PSLRA provides that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).

## III. DISCUSSION

### I. Count I – Section 10(b).

Section 10(b) of the Exchange Act forbids (1) "the use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of Securities and Exchange Commission rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5 prohibits, *inter alia*, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5 (2004).

"To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter – a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities market (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

**(1) Material Misrepresentation or Omission.** Defendants move to dismiss Count I for failure to plead false or misleading statements with particularity. Plaintiffs contend that

Defendants' statements about their contractual relationship with BOP were materially misleading because they omitted information that (i) GEO Group's contracted private facilities lacked adequate safety and security standards, and were less efficient than BOP facilities; (ii) GEO Group's private facilities often failed to adhere to contractual obligations; (iii) a significant risk existed that the DOJ would recommend phasing out BOP's contracts with GEO; and (iv) consequently, a risk also existed that other government agencies would choose to investigate GEO Group's private prisons.

There are three types of statements that Plaintiffs allege triggered a duty to disclose that GEO Group's inadequate prison conditions put its BOP contracts at risk:

- Statements that GEO Group relies on BOP, ICE, and U.S. Marshals Service contracts for a large percent of its revenue, as well as statements disclosing its BOP contracts, and the resulting revenue;

- GEO Group's statement about contract compliance, specifically, "We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract;" and

- Statements touting the strength of GEO Group's relationship with BOP, and its optimism about leveraging that relationship for future growth.

**<u>Statements about Current Contracts and Revenue.</u>**[4] Defendants argue that Plaintiffs have not pled any facts showing the statements detailing GEO Group's current revenue, its BOP

---

[4] The following statements are at issue in this section:

(1) "We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies." (*Id.* ¶¶ 67, 77, 91, 103, 104, 116).

(2) GEO Group's statement that around 40% of its revenues came from BOP, ICE, and U.S. Marshals Service contracts, and that GEO Group had worked with various governments for approximately 25 years. (*Id.* ¶¶ 68, 77, 91, 103, 104, 116, 117).

(3) GEO Group's financial and operating results for each relevant quarter. (*Id.* ¶¶ 70-75, 81-82, 85, 87-88, 94-95, 97-98, 100-101, 107-108, 113-114. 121, 122-124).

contracts, and the share of its revenue attributable to the BOP, ICE, and U.S. Marshals Service contracts were false or misleading. Plaintiffs contend that Defendants' statements about GEO Group's BOP contracts, and the resulting revenue, misleadingly portray GEO Group as a company with a steady revenue source despite the significant risk that the DOJ would recommend phasing out these contracts due to inadequate conditions at GEO Group prisons.

"Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Inv'r Grp.*, 658 F.3d at 1305 (citing 17 C.F.R. § 240.10b-5(b)). "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." *Id.* (internal citation and quotation omitted).

"A statement is misleading if in the light of the facts existing at the time of the statement[,] a reasonable investor, in the exercise of due care, would have been misled by it." *Id.* (internal citation and quotation omitted). "Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." *Id.* (internal citation and quotation omitted). "Requiring that disclosures be complete and accurate does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." *Id.* (internal citation and quotation omitted). "A corporation has a duty to neutralize only the natural and normal implication of its statements." *Id.* (internal citation and quotation omitted).

In *FindWhat*, the corporate defendant ran a "pay-per-click" advertising service, for which revenue was determined, in part, by the price that advertisers bid for a click on their ads, which in

---

(4) GEO Group's announcement of new contracts with BOP and expected revenues from those contracts, as well as bid opportunities that GEO Group was pursuing. (*Id.* ¶ 102, 106, 112, 115, 119, 122).

turn increased when clicks were more likely to convert into a sale. *Id.* at 1291. For "pay-per-click" advertising services, click fraud, when a robot clicks on ads, generates short-term revenue, but can harm a company in the long term because it decreases the amount that advertisers are willing to bid for a click. *Id.* The plaintiffs alleged that the defendant's revenue disclosures were misleading because they portrayed the company as a growth company without revealing that such growth was based on illicit click-fraud operators. *Id.* at 1305. The Eleventh Circuit held that the defendant's general statement about revenue did not impose a duty to disclose the underlying quality of the defendant's click traffic, reasoning as follows:

> No reasonable investor would believe that a conclusory, but apparently accurate, report of company-wide revenue growth naturally implied that all was well within every component of the company that could possibly affect revenue in the future. Otherwise, factual reporting of past earnings – disclosure of which the securities laws always encourage and frequently require – would become a treacherous endeavor indeed. Under the [p]laintiffs' preferred rule, company reports of revenue growth – no matter how factually accurate and no matter the level of generality – would be made at the company's peril, carrying a concomitant obligation to reveal a detailed picture of every aspect of the company's operations that could possibly bear on future revenue. This is not the rule. "Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999); *see also Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994) ("[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy . . . ").

*Id.* at 1306.

Here, Defendants' general statements about GEO Group's revenue, and the relationships and contracts generating that revenue, do not imply that all is well within every component of GEO Group's contractual relationships that could affect revenue in the future. Rather they are conclusory, but apparently accurate, statements of revenue. Because they do not convey a false impression about the underlying factors affecting Defendants' contractual relationships, they do not impose a duty to disclose the quality of conditions in Defendants' prisons, or the likely effect of

such conditions on Defendants' contractual relationships. Accordingly, Defendants' omission of this information, as pled, was not misleading under the circumstances, and therefore neither were the statements themselves. *See* 17 C.F.R. § 240.10b-5(b).

**<u>Statement about Contract Compliance.</u>**[5] Defendants argue that Plaintiffs have not pled facts showing Defendants' statement that GEO Group operates its facilities in accordance with contract guidelines is false or misleading, arguing that this statement is not a guarantee or a representation, but rather a confirmation that GEO Group is subject to certain standards. Plaintiffs characterize this statement as a representation of current compliance with contractual standards, and contend that the 2016 OIG Report, Reeves Audit, Wessler Article, ACLU Report, and confidential witness statements document GEO Group's non-compliance.

The PSLRA requires Plaintiffs to state the reasons why a statement was false at the time that it was made. *See* 15 U.S.C. § 78u-4(b)(1); *see, e.g., Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1384-85 (M.D. Ga. 2000), *rev'd on other grounds by Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001) (holding allegations that company's sales were not meeting expectations in September 1996 did not show that company's sales were not meeting expectations in February 1996 when allegedly misleading statement was made). "A sufficient level of factual support for a 10b claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotations and citations omitted).

The Wessler Article and confidential witness statements document incidents of poor medical care and security at GEO Group's facilities, but they do not offer any insight into whether these

---

[5] The following statement is at issue in this section: "We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract." (*Id.* ¶¶ 68, 77, 91, 103, 104, 117).

incidents rose to the level of contract violations. The ACLU Report states that GEO Group used isolation cells in contravention of BOP policy, but does not identify the relevant timeframe. The ACLU Report also states that BOP monitors expressed frustration in 2010 that GEO Group "is unable to successfully achieve their own plans of action to correct deficient areas," but that was before the Class Period began in March 2012.

The 2016 OIG Report, the Reeves Audit, and BOP Reports come closer to demonstrating instances of non-compliance, but also fail to show that GEO Group's statements about contract compliance were false when made. The 2016 OIG Report states that in the fall of 2012, the BOP issued GEO Group's D. Ray facility a cure notice, which is issued to a contract prison that is not meeting the vital functions of its contract, but Defendants made the statement about GEO Group's contract compliance in March 2012, March 2013, March 2014, February 2015, and February 2016, not in the fall of 2012. Thus, it is possible that GEO Group was in compliance with contractual requirements at the times the statement was made.

The Reeves Audit states that "the contractor" had failed to comply with contractual requirements in the areas of billing and payment, correctional and health services staffing, and internal quality control, but does not specifically identify GEO Group, which was one of many subcontractors at Reeves, or the time frame of the contract violations. Although the Audit noted that Reeves' medical contractor failed to meet contractual staffing obligations in the medical unit for at least 34 of the 37 months from 2010 to 2013, according to the Audit, the medical contractor was CHC, not GEO Group.

Finally, the Amended Complaint alleges that unidentified BOP Reports document deficiencies in healthcare at GEO Group's prisons "for years," but it does not identify the dates or the nature of these deficiencies. The Amended Complaint also alleges that BOP considered not

renewing its contract with Reeves County, noting 230 citations and $2 million in penalties for compliance failures at the Reeves facility, but it does not identify the timeframe or whether GEO Group was the contractor responsible for the violations. The head of BOP's Privatization Management Branch wrote that BOP inspectors "have identified serious issues in health care," but this email was sent before the Class Period began. Accordingly, Plaintiffs have failed to plead specific facts that would lead to an inference that Defendants' statements about compliance were false when they were made.[6]

**Statements about GEO Group's BOP Relationship and Future Growth.**[7] Defendants argue that the statements about GEO Group's relationship with BOP and future growth are non-

---

[6] Because I find that Plaintiffs do not plead the falsity of Defendants' statement with particularity, I do not address Defendants' argument that this statement is not a representation that GEO Group is in compliance with contractual standards, but rather a confirmation that such standards apply.

[7] The following statements are at issue in the section:

(1) "We have developed long-term relationships with our federal, state and other governmental customers, which we believe enhance our ability to win new contracts and retain existing business." (*Id.* ¶¶ 68, 77, 91, 103, 104).

(2) "We have long-standing partnerships with the Federal Bureau of Prisons, the United States Marshals Service and the United States Immigration and Customs Enforcement or ICE. And we provide cost-effective solutions for them at a number of facilities across the country. We continue to see meaningful opportunity for us to partner with all 3 of these federal agencies, notwithstanding the various issues with the federal budget." (*Id.* ¶ 76, 80, 83, 86, 89, 93, 96, 99, 102, 106, 109, 110-111).

(3) "We are very pleased with our strong fourth quarter results and our outlook for 2016 which reflect the continued organic growth of our diversified business segments of GEO Corrections & Detention and GEO Care." (*Id.* ¶ 115).

(4) "We believe that our unique platform of correctional and rehabilitation services better positions GEO to capture future growth, which will enhance value for our shareholders and allow us to continue to grow our earnings, cash flows and dividend payments." (*Id.* at 119).

(5) "[W]e are optimistic that our projects will be reviewed favorably for continued use. We have a very good relationship with the Bureau of Prisons and our seven facilities

actionable statements of corporate optimism, predictive opinions, or forward-looking statements protected by safe harbor. Plaintiffs contend that (i) the statements were misleading as to the facts forming the basis for GEO Group's optimism, specifically the strength of GEO Group's relationship with the BOP and the quality of its services, and (ii) any forward-looking statements are not entitled to safe harbor because the accompanying risk disclosures were not meaningful or because Defendants lacked a reasonable basis for believing the statements.

"Statements regarding *future* performance are actionable only if they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them." *FindWhat*, 658 F.3d at 1304 (internal citation and quotation omitted). Defendants' statements contain a mix of generalized optimism, opinion, forward-looking projections, and statements of fact. The statements of fact tout the strength of GEO Group's current relationship with the BOP and the quality of GEO Group's services as significant factors in predicting the likelihood of BOP's continued use of GEO Group's prison services.

However, only material misrepresentations or omissions are actionable. 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact . . . . "). "[A] misstatement or omission is material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (citing *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also FindWhat*, 658 F.3d at 198-99 (holding that, to avoid being misleading, statements of fact "triggered a duty to disclose [any] grave defects that

---

with the 15,000 beds operational performances at the appropriate levels and exceeding our expectations and the client's expectations. So we have no reason to believe that they the client will not view them appropriately on a going forward basis." (*Id.* ¶ 122).

existed within the [relationship and services] [] voluntarily touted"); *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 770-71 (11th Cir. 2007) (holding that duty to disclose all material information relating to a particular subject arises by voluntarily "touting" the subject to investors). Information that GEO Group's services were inadequate, or that its relationship with BOP was fragile, if true, may have significantly altered the total mix of information available to the reasonable investor, and if so, would have been necessary for a reasonable investor to assess whether the quality of GEO Group's services and the strength of its relationship with BOP were likely to enhance GEO Group's ability to obtain additional contracts. *See Merchant Capital*, 483 F.3d at 771 (holding company's statement, touting consultant's expertise for generating returns without disclosing consultant's previous personal bankruptcy, was misleading).

However, as a preliminary matter, the Amended Complaint fails to plead specific facts showing that GEO Group's services were inadequate, or that its relationship with BOP was strained. As discussed above, the Wessler Article, ACLU Report, and confidential witnesses address safety concerns at GEO Group's facilities, and provide anecdotal evidence that conditions in GEO Group prisons were worse than in BOP prisons, but do not provide sufficient facts to infer that conditions in GEO Group's prisons were inadequate or otherwise jeopardized GEO Group's relationship with the BOP. And although the 2016 OIG Report states that the BOP issued GEO Group's D. Ray facility a cure notice in the fall of 2012, there are no allegations that contract violations persisted or that the cure notice permanently impaired GEO Group's relationship with the BOP. Indeed, the Amended Complaint pleads facts suggesting the opposite may be true. According to the Amended Complaint, GEO Group's relationship with BOP continued for four more years after the 2012 cure notice, and it was not until the DOJ directed the BOP to phase out its contracts with GEO Group

that BOP took action.[8] Accordingly, Plaintiffs fail to plead specific facts showing that GEO Group's statements about the quality of its services or the strength of its relationship with BOP were misleading.[9]

In sum, Plaintiffs have not satisfied the particularity requirements under Rule 9(b) or PSLRA. The Amended Complaint, thus, fails to plead a material misrepresentation or omission.

**(2) Scienter.** Under PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." § 78u-4(b)(2). "In this Circuit, § 10(b) and Rule 10b-5 require a showing of either an intent to deceive, manipulate, or defraud, or severe recklessness." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (internal quotation marks and citations omitted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Bryant*, 187 F.3d at 1287 n.18. Accordingly, "[a] complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

---

[8] The closest Plaintiffs come to pleading a material misrepresentation is the August 2, 2016 earnings call. This was seven days before Zoley's response letter to the 2016 OIG Report. However, the Amended Complaint does not allege when Zoley or GEO Group received the Report.

[9] Having found that Plaintiffs have not sufficiently pled that Defendants' statements about GEO Group's services and BOP relationship were false or misleading, I need not determine the extent to which Defendants' statements are statements of corporate optimism, opinion, or entitled to safe harbor.

This inquiry asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. In doing so, "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Id.* at 322, 326. To survive a motion to dismiss, the complaint must "allege facts supporting a strong inference of scienter for *each* defendant with respect to *each* violation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (emphasis added) (internal quotation marks and citations omitted).

Plaintiffs allege that Defendants either had knowledge of, or were severely reckless to, the danger of misleading investors by stating (1) GEO Group's revenue, (2) that GEO Group complied with contractual standards, and (3) that it had a strong relationship with BOP and provided quality services that would enable it to retain current contracts and obtain future contracts. To support an inference of scienter, Plaintiffs cite the Individual Defendants' motive to sell shares from their personal portfolios, their high-level positions at GEO Group, GEO Group's internal reporting structure, frequent BOP audits, prisoner lawsuits, prison disturbances, the Wessler Article, and the ACLU Report.

"[A]lthough motive and opportunity to commit fraud may under some circumstances contribute to an inference of severe recklessness," standing alone, they are insufficient to do so. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir. 1999). On their own, Plaintiffs' allegations that the Individual Defendants stood to benefit from the sale of securities at an inflated price do not support scienter, and Plaintiffs do not plead additional facts to show how Individual Defendants benefitted from the allegedly misleading statements. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (finding allegations that defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation, and the desire to

sell stock at inflated prices were not enough to pled scienter); *see also Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers."). For example, Plaintiffs do not allege that Defendants sold securities during the Class Period, or that such sales were dramatically out of line with prior trading practices. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (finding no motive to personally benefit when "[t]here is no claim here that false statements were made in an effort to sell off shares held by management").

Similarly, merely holding a position of power does not lead to an inference of scienter without specific allegations of the Individual Defendants' role in the fraud. *See In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1360-61 (S.D. Fla. 2005) (Middlebrooks, J.). Plaintiffs' allegation that Zoley was a "hands on" CEO is nothing more than a conclusory label. *See, e.g., In re Republic Servs., Inc. Sec. Litig.*, 134 F. Supp. 2d 1355, 1360 (S.D. Fla. 2001); *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *19 (S.D. Fla. Apr. 19, 2013). The only allegation that comes anywhere close to showing the Individual Defendants had a role in the fraud was a confidential witness statement that corporate headquarters directed facilities to maintain staff vacancies to increase profits. However, this allegation does not provide that any of the Individual Defendants issued, or even knew about, this directive. Neither does low staffing necessarily mean that GEO Group would be unable to maintain adequate prison conditions.

Plaintiffs' allegations that GEO Group had an internal reporting structure, without particular allegations of what information the Individual Defendants actually received, do not support a strong inference of scienter. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (concluding that general allegations about what was discussed at meeting involving senior

executives was insufficiently particularized where the complaint "failed to allege what was said at the meeting, to whom it was said, or in what context"). Although Plaintiffs allege that "problems" were brought to the attention of Hurley, Zoley, and Evans, they do not allege the content of the information that the Individual Defendants received or the reasonable conclusions that they drew from this information.[10] Similarly, a compliance director, who stated that the compliance directors distributed a monthly report of the results of contract compliance audits to GEO Group's executives, did not provide any information as to the content of these reports. The absence of allegations detailing the reports' contents, when Plaintiffs had access to a director who compiled the reports, gives rise to the alternate inference that the reports did not give the Individual Defendants notice of inadequate prison conditions that could jeopardize GEO Group's contracts. *See FindWhat*, 658 F.3d at 1303 (finding the omission of relevant allegations gave rise to an inference against scienter given that plaintiffs had access to numerous employee witnesses, who could have provided the information); *cf. Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008) ("[T]he weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case.").

Plaintiffs' other allegations address only whether information about incidents at GEO Group's prisons existed, not whether and when the Individual Defendants received this information, and the reasonable inferences they drew from it. There are no allegations as to whether and when the Individual Defendants received notice of BOP audits, or the content of these audits during the relevant times.[11] There are no allegations that the Individual Defendants were notified of prisoner

---

[10] The Amended Complaint does not allege that Donahue received any information relevant to the allegedly misleading statements through the internal reporting structure.

[11] As discussed above, the Amended Complaint alleges that BOP Reports document deficiencies in healthcare at GEO Group's prisons and compliance failures at Reeves, but it does not identify the dates or the nature of these deficiencies.

lawsuits against GEO Group, or if they were, the import that they attributed to such lawsuits, given the frequency of prisoner litigation. Plaintiffs do not allege that the Individual Defendants read the Wessler Article or ACLU Report. Indeed, it appears that the Wessler Article was published after the Class Period. Finally, the prison disturbances in GEO Group prisons, cited by the 2016 OIG Report, all occurred before the Class Period.

The alternate inferences that can be drawn from the Amended Complaint are more compelling than the inference that Defendants touted GEO Group's relationship with BOP despite their awareness that inadequate conditions in GEO Group prisons created a significant risk of losing BOP contracts. GEO Group had provided services to the BOP for decades, which services the BOP frequently audited. In addition, GEO Group obtained several new contracts and contract renewals with the BOP over the course of the Class Period. These facts support an alternate inference that the Individual Defendants reasonably believed GEO Group had a strong relationship with the BOP, and that there was not a significant risk that the DOJ would phase out BOP's use of contractors due to conditions in GEO Group's prisons. Although confidential witnesses stated that there was talk that the DOJ would revoke private prison contracts due to safety, security and budget factors and that Zoley's son-in-law said private prison companies could be "losing business soon," these allegations are too conclusory to support a strong inference of scienter. *See FindWhat*, 658 F.3d at 1303 (holding "Plaintiffs' allegation that it was 'commonly known' within the Company that Defendants relied on click fraud, [] is conclusory and plainly lacks sufficient particularity to create a strong inference of scienter").

In sum, Plaintiffs have failed to allege facts to support a strong inference that any Individual Defendant knowingly, or with severe recklessness, issued materially misleading statements about GEO Group's prison conditions and its relationship with the BOP. As to GEO Group,

"[c]orporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them." *See Thompson*, 610 F.3d at 635. Where, as here, a complaint fails to allege scienter as to a corporate officer, the complaint also fails to allege scienter of the corporation. *Id.* (concluding where complaint fails to sufficiently plead scienter as to any corporate directors or officers, complaint fails to plead scienter as to corporation). Accordingly, the Complaint fails to plead scienter as to GEO Group.

Because Plaintiffs have not pled a material misrepresentation or omission, or scienter, the Amended Complaint fails to state a claim under Section 10(b) and Rule 10b-5.[12]

**B. Count II – Section 20(a).**

Section 20(a) of the Exchange Act creates liability for those who control others who commit an underlying violation of the federal securities laws. 15 U.S.C. § 78t(a). Because Plaintiffs fail to plead a primary violation of Section 10(b) of the Exchange Act, Plaintiffs do not plead a violation of Section 20(a).[13] *See Mizzaro*, 544 F.3d at 1237 ("Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded.").

---

[12] Defendants also argue that Plaintiffs have not alleged loss causation because (1) GEO Group's filings disclosed that it would be adversely affected in the event its government clients decided to terminate or not renew its contracts, and (2) prior public reports of conditions in GEO Group's prisons, including the 2016 OIG Report, did not cause GEO Group's stock price to drop. However, I decline to address this argument in light of my finding that Plaintiffs have failed to state a claim under § 10(b) by failing to allege a material misrepresentation and scienter.

[13] I decline to address the Individual Defendants' argument that Plaintiffs fail to allege how each Individual Defendant controlled GEO Group or was responsible for the alleged misleading statements.

## CONCLUSION

The Amended Complaint fails to allege a violation under the Exchange Act, and is, therefore, dismissed without prejudice. Plaintiffs may file a Second Amended Complaint by March 30, 2017.[14]

**ORDERED AND ADJUDGED** that

(1) Defendant The GEO Group, Inc.'s Motion to Dismiss (DE 65) is **GRANTED.**

(2) Defendants George C. Zoley, Brian R. Evans, John Hurley, and David Donahue's Motion to Dismiss (DE 66) is **GRANTED.**

(3) Plaintiffs may file a Second Amended Complaint by **March 30, 2017**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 22 day of February, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record

[14] Plaintiffs have not filed a motion for leave to amend the complaint but have indicated in response to the Motions to Dismiss a desire to amend the complaint.